MOSES & SINGER LLP
James M. Sullivan
Christopher R. Gresh
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Tel: (212) 554-7800
Fax: (212) 554-7700

*Counsel for the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                    :

In re:                        :    Chapter 11
                    :

PRETTY GIRL, INC.,          :    Case No. 14-11979 (SHL)
                    :

          Debtor.        :
                    :

-------------------------------------------------------------X

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION**
**FOR ENTRY OF AN ORDER IMMEDIATELY DIRECTING APPOINTMENT OF A**
**CHAPTER 11 TRUSTEE PURSUANT TO SECTION 1104(a) OF THE BANKRUPTCY**
**CODE, AND FOR RELATED RELIEF, AND OPPOSITION TO DEBTOR'S MOTION,**
**PURSUANT TO SECTION 1112(a) OF THE BANKRUPTCY CODE, FOR AN ORDER**
**CONVERTING ITS CHAPTER 11 CASE TO ONE UNDER**
**CHAPTER 7 OF THE BANKRUPTCY CODE**

The Official Committee of Unsecured Creditors of Pretty Girl, Inc. (the "Committee"),

by its undersigned counsel, hereby moves (the "Motion") for entry of an order immediately

directing appointment of a chapter 11 trustee pursuant to section 1104 of title 11 of the United

States Code (the "Bankruptcy Code"), and for related relief, including immediately terminating

the Debtor's authority to use cash collateral pending the appointment of a chapter 11 trustee and

directing the Debtor to transfer sufficient funds to fund the Carve-Out (as defined in the Final

Cash Collateral Order) into escrow with its counsel.  This Motion also constitutes the

Committee's opposition to the Debtor's Motion, Pursuant to Section 1112(a) of the Bankruptcy

Code, for an Order Converting Its Chapter 11 Case to One under Chapter 7 of the Bankruptcy

Code [Docket No. 127] (the "Conversion Motion").  In support of the Motion, and in opposition

to the Conversion Motion, the Committee submits the supporting Declaration of Charles Berk

(the "Berk Declaration"), sworn to on December 18, 2014, and the supporting Declarations of

certain Committee members, including Ultimate Off Price (Lior Sfadia), sworn to on December

16, 2014, and 2253 Apparel, Inc. (Doron Kadosh), sworn to on December 17, 2014 (together, the

"Committee Member Declarations"), and respectfully represents:

## PRELIMINARY STATEMENT

1.      Conversion of this chapter 11 case to chapter 7 will likely result in the worst

possible outcome for unsecured creditors – no recovery on their claims.  The appointment of a

chapter 11 trustee, however, will give unsecured creditors an opportunity for a more favorable

outcome.  Because of this, this Court should deny the Conversion Motion and instead grant the

Committee's instant Motion and immediately direct appointment of a chapter 11 trustee.

2.      A debtor does not have the absolute right to convert its case to chapter 7 without

regard to the effect on creditors.  Courts have refused to honor a debtor's preference where the

debtor has exhibited bad faith and/or where conversion is not in the best interest of creditors.

The Debtor's conduct and that of the Debtor's sole shareholder, Albert Nigri ("Nigri"), prior to

and during the chapter 11 case, demonstrates bad faith.  Nigri has manipulated the flow of funds

among the Debtor and the Debtor's non-debtor affiliates (also wholly-owned by Nigri) for his

benefit and to the detriment of creditors.  During the chapter 11 case, Nigri caused the Debtor's

non-debtor affiliate stores to delay payments due to the Debtor for post-petition inventory sold

by the Debtor to such non-debtor affiliates, behind other expenses paid.  Berk Declaration, ¶¶ 13,

14.  Meanwhile, Nigri caused the Debtor to prioritize payments to his other non-debtor

companies for post-petition inventory they supplied. *Id.* ¶ 14.  Nigri caused one of these non-debtor affiliate suppliers, PGLA Sportswear, to cease business shortly after the Debtor repaid its alleged post-petition debt in full to PGLA Sportswear, frustrating the Debtor's ability to collect on a preference claim of approximately $3,600,000 against PGLA Sportswear.  *Id.* ¶¶ 14, 15.  Nigri also caused the Debtor to repay its alleged petition post-debt to another non-debtor affiliate supplier, Mega Wear, in full despite a preference claim of approximately $1,500,000 against Mega Wear.  *Id.* ¶ 14.  Moreover, the Debtor overpaid Mega Wear by at least $115,000 and as such Mega Wear owes the Debtor that amount.  *Id.*

3.      It appears that all of Nigri's known companies, including those owned by him and by his family members, have long operated as a single, unified, vertically integrated business operated by common management and ownership.[1]  These affiliated companies include the single-purpose entities that own and operate the non-debtor retail stores, the non-debtor manufacturing/importing companies that sell to these stores via the Debtor, and who obtained secured financing from JPMorgan Chase Bank, NA ("JPMorgan") and unsecured trade credit from other wholesalers in order to buy inventory for the stores.  Berk Declaration, ¶ 4.  During the year prior to the Debtor's chapter 11 filing, approximately $10,400,000 of the $20,000,000 of disbursements made by the Debtor were to or on behalf of the entities owned and/or controlled by Nigri.  Berk Declaration, ¶ 5 & Exhibits 1 and 2 thereto.

4.      Nigri arbitrarily allocates cash among his companies as he deems appropriate.  He did this pre-petition and continues to do it post-petition.  His plan is to continue to operate some of his non-debtor manufacturing/importing companies and to liquidate inventory through the stores into the indefinite future.  However, his plan has been to strip the Debtor of its inventory and then to leave it with uncollectible accounts receivable due from the stores that are going out

---

[1]  With the exception of Jasmine (as defined herein), which is owned by Nigri's son.

of business.  Since commencement of this case, the Debtor has not repaid any significant portion

of the secured debt to JPMorgan and has built up no cash, but its inventory has been almost

completely depleted, as the Debtor has continued to "sell" goods to the non-debtor stores despite

their delay in payment for such goods.

5.      Because Nigri has personally guarantied the Debtor's debt to JPMorgan, he will

enable the Debtor to collect just enough of those accounts receivable from the stores to satisfy

his guarantee, but not enough to pay anything to unsecured creditors of the Debtor.

6.      Nigri fraudulently induced the Debtor's trade creditors to ship goods to the Debtor

on credit by leading the trade creditors to believe that all of the Pretty Girl stores and affiliated

business, including the Debtor, were part of a single legal entity.  *See* Committee Member

Declarations.  In fact, the Debtor, which has been bearing the administrative expenses for his

other companies, now claims that its only assets are the inventory sold to, and accounts due

from, the stores that Nigri owns and controls.  In addition to paying administrative expenses for

the benefit of these stores, the Debtor has close to $2,800,000 of debt owed to JPMorgan, which

claims to be secured by all inventory and accounts of the Debtor and the stores, over $6,000,000

of non-insider unsecured trade debt, and an approximately $3,300,000 judgment in favor of

Osama Hazza Saleh.  The Debtor has continued to "sell" goods to the stores, despite the fact that

the stores are not paying the Debtor for these goods and, instead, are paying other Nigri entities.

Moreover, the Debtor continues to pay administrative expenses for the stores and Nigri a salary

of $500,000 annually for stripping the Debtor of all its assets and leaving unsecured creditors

with an empty shell.

7.      Creditor recoveries in this case will require an understanding of the web of

intercompany dealings Nigri has created and an understanding of the best way to recover value

from his other affiliated clothing businesses, both manufacturers/importers and retail stores.  It is

highly likely that these other businesses will be substantively consolidated into this estate, given

among other things the misrepresentations made to creditors about the unitary business, and will

have to be operated by the chapter 11 trustee.  Directing the appointment of a chapter 11

operating trustee with retail operating experience – as opposed to conversion to chapter 7 and the

appointment of a panel chapter 7 trustee – would leave that option open, while conversion to

chapter 7 would foreclose it and is not in the best interests of the Debtor's creditors.

8.      The Committee believes that the Debtor and its non-debtor affiliates held

themselves out to its creditors as a single entity, and the Debtor and its affiliates did not observe

corporate formalities or otherwise conduct business with one another as distinct legal entities.

Nigri has announced his intention to continue to conduct business through some of these entities.

Accordingly, the Debtor and its affiliates who will continue to operate are prime candidates for

substantive consolidation, and that form of relief should not be foreclosed to the unsecured

creditors by conversion to chapter 7.  If the Debtor's non-debtor affiliates are substantively

consolidated with the Debtor, the chapter 11 trustee would have the opportunity to run and

manage the stores and the other manufacturing affiliates that are still operating, which the

Committee believes would result in a more favorable outcome for the Debtor's creditors than

would liquidation following the appointment of a chapter 7 trustee.

9.      Chapter 7 is a dead-end that will likely produce nothing for unsecured creditors.

Directing the appointment of a chapter 11 trustee will cost no more, but is more likely to leave

unsecured creditors with a prospect of recovery.  Accordingly, the Committee requests that this

Court immediately direct appointment of a chapter 11 trustee and deny the Conversion Motion.

## **BACKGROUND**

10.     On July 2, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

11.     Since the Petition Date, the Debtor has continued to operate its business and manage its property as a debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.     On July 15, 2014, the United States Trustee for Region 2 appointed the Committee.

13.     To date, no trustee or examiner has been appointed in the Debtor's case.

14.     On October 2, 2014, this Court entered the Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection [Docket No. 83] (the "Final Cash Collateral Order").

15.     On October 23, 2014, this Court entered the Order, Pursuant to 11 U.S.C. §§ 105(a) and 331, Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals [Docket No. 103] (the "Compensation Order").

16.     During the course of this case, the Debtor failed to set aside any funds to pay the professional Carve-Out (as defined in the Final Cash Collateral Order).

17.     In anticipation of the case management conference held in this case on December 2, 2014, on December 1, 2014, counsel for the Committee submitted a letter [Docket No. 123] to this Court to inform this Court of certain troubling actions taken by the Debtor and indicating that it intended to file a motion for the appointment of a chapter 11 trustee.

18.     During the December 2, 2014 case management conference, this Court agreed to expedite consideration of the Committee's anticipated motion seeking the appointment of a

chapter 11 operating trustee.  In particular, this Court provided the Committee with an

anticipated return date of December 18, 2014 on such motion if the Committee filed its

anticipated motion by December 5, 2014.  This Court invited the Committee to request a sooner

return date for its anticipated motion should the circumstances warrant it.  In addition, following

the case management conference, this Court directed the Debtor not to make any payments to

estate professionals pending further direction from this Court.

19.    The following day (December 3, 2014), counsel for the Debtor informed counsel

for the Committee that the Debtor intended to file a motion to convert the case to chapter 7 with

a return date of January 6, 2015.  As a result of this and the Debtor's failure to provide promised

documents and information, on December 4, 2014, the Committee requested a conference call

with this Court to discuss the possibility of moving up the return date of its anticipated motion

for the appointment of a chapter 11 trustee.

20.    On December 4, 2014, the Court held a conference call with counsel for the

Debtor, the Committee, and the United States Trustee.  During the conference call, the Debtor

indicated that instead of litigating regarding the appointment of a chapter 11 trustee, it would

rather consent to the immediate appointment of a chapter 7 trustee.  The Debtor provided no

explanation for why it would oppose appointment of a chapter 11 trustee but consent to a chapter

7 trustee.  This Court then requested that counsel for the Committee prepare a draft stipulation

for the conversion of the case to chapter 7.  This Court also directed that the Debtor should not

transfer any assets to an insider without the consent of the Committee and the United States

Trustee or authority of this Court.

21.    Following the December 4, 2014 conference call, counsel for the Debtor and the

Committee engaged in further settlement discussions in an effort to try to reach a possible

agreement that could avoid the conversion of the case to chapter 7, which the Committee believes is not in the best interest of the Debtor's unsecured creditors.  On December 8, 2014, the Debtor and its professionals met with the Committee's professionals.

22.     On December 9, 2014, counsel for the Debtor informed counsel for the Debtor that it had decided to proceed with its motion to convert the case to chapter 7 rather than to continue discussing an alternative to chapter 7.

23.     On December 11, 2014, the Debtor filed the Conversion Motion seeking to convert this chapter 11 case to a case under chapter 7 of the Bankruptcy Code.  The Committee does not believe conversion of the case to chapter 7 is in the best interest of the Debtor's unsecured creditors and, for this reason, is opposing the Conversion Motion.  Instead, the Committee believes the appointment of a chapter 11 operating trustee is in the best interest of the Debtor's creditors.

**Grounds for Substantive Consolidation**

24.     Nigri is the sole officer, director, and shareholder of the Debtor.  Declaration of Albert Nigri Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York [Docket No. 1] (the "Nigri Declaration"), ¶¶ 1, 22.  In addition to being the Debtor's sole shareholder, Nigri is the 100% shareholder of each of the Debtor's non-debtor affiliates, including each of the stores (the "Stores") that purchases inventory from the Debtor exclusively. Id. ¶¶ 5, 6.  Nigri also wholly-owns and/or controls non-debtor affiliate suppliers that supply inventory to the Debtor, namely PGLA Sportswear, Mega Wear, and Jasmine L.A. Corp.  Berk Declaration, Exhibit 2.

25.     Nigri admitted during the Debtor's 341 meeting of creditors that he does not operate the Debtor and its affiliates as independent stand-alone entities that transact business on

an arms-length basis.  Indeed, during the one-year period to the Petition Date, in total the Debtor

made disbursements of approximately $20,000,000, of which approximately $10,400,000 were

paid to or for the benefit of insiders and/or non-debtor affiliates.  Berk Declaration, ¶ 5 &

Exhibits 1 and 2 thereto.  Instead, Nigri admitted that he alone sets the terms with which the

Debtor and its affiliates conduct business with one another, including price, and that such terms

are manipulated as he sees fit in order to achieve his desired ends.  Indeed, the Committee

believes that the Debtor and its affiliates have not acted as separate legal entities, have not

observed corporate formalities, have not engaged in arms-length transactions, and have not held

themselves out to creditors as separate legal entities.  On the contrary, some trade vendors have

reported to the Committee that they were led to believe that the Pretty Girl stores and related

businesses, including the Debtor, were part of a single legal entity.  *See* Committee Member

Declarations.  There clearly are substantial grounds to substantively consolidate all of the Nigri-

controlled affiliates into the Debtor, through which Nigri managed them.

26.     It appears from the Monthly Operating Reports ("MOR") filed with the Court that

the Debtor continued to ship goods to the stores aggregating approximately $4,200,000.  Upon

information and belief, inventory sold to these related parties was provided on 60 day terms.

Inventory purchased by the Debtor from non-debtor related parties was also on 60 day terms,

however according to the Debtor's November MOR, as of November 30, 2014, no amounts are

due to non-debtor related parties in the aggregate.  Berk Declaration, ¶ 9.

27.     There are numerous cash transfers among the various affiliates that are

inexplicable except as evidence that all of the affiliates were operated by and for the benefit of

Nigri.  For example, PGLA Sportswear (non-debtor affiliate supplier) was making payments to

Nigri's luxury condominium (Ashton Westwood) up until October 2013 when the Debtor took

over making such payments; PGLA Sportswear and Mega Wear (also a non-debtor affiliate supplier) made payments totaling $37,000 to Liberty LLC (which was the predecessor to the Debtor that operated a chain of stores under the Liberty trade name); Mega Wear made substantial cash transfers to the Debtor and to PGLA Sportswear, although Mega Wear buys nothing from either.  Affiliated Stores made payments to other affiliated Stores, and the Debtor paid more than $2,000,000 to affiliated Stores during the year prior to the Bankruptcy, despite the fact that the Stores buy from the Debtor and owe it money.  Berk Declaration, ¶ 12 & Exhibits 3 and 4 thereto.

28.    Judgment has already been entered against the Debtor and one of the Stores for torts committed by employees of one of the Stores against Osama Hazza Saleh, another Store employee who now sits on the Committee.  *See* **Exhibit A** hereto (Memorandum and Order, dated September 28, 2012, in *Osama Hazza Saleh v. Pretty Girl, Inc., et al.*; Docket No. 09-CV-1769 (ENV) (RER) (E.D.N.Y. Sept. 28, 2012).  Prior to trial, the court denied the Debtor's motion for summary judgment seeking to dismiss veil piercing claims filed by Mr. Saleh in his suit against one of the Stores and the Debtor for "hostile work environment," assault and battery, and negligence.  Judgment in the amount of approximately $3,300,000 was entered after trial against the Debtor.

29.    Despite the fact that the Debtor is in bankruptcy and Nigri is therefore obligated to cause the Debtor to act in the best interests of the Debtor's creditors, Nigri has continued to manipulate his wholly-owned entities to make sure that cash flows from the Debtor to the affiliates in an effort to preserve his interests at the expense of creditors of the Debtor.  Indeed, Nigri has admitted to the Committee's professionals that his primary concern is to escape any personal liability on his guarantee of the JPMorgan loan.  Historically, the cash of the Debtor and

its affiliates was swept into a single concentration account controlled by the Debtor until July

2013.  After that date, Nigri stopped the cash sweeps and caused the Debtor to extend 60 day

payment terms to his stores for inventory purchases.  During the chapter 11 case, Nigri caused

the Stores to delay payments to the Debtor for the inventory that they purchased from the Debtor,

behind other expenses paid.  Berk Declaration, ¶ 13.  The Debtor states in the Conversion

Motion that the Debtor's projections of revenue, which is a function of the Stores' sales, were

overly optimistic.  Yet it also admits that the Stores' performance is consistent with their

historical results.  *See* Conversion Motion, ¶ 14.  Thus, there was no excuse for the Debtor to

utilize "overly optimistic" projections for store sales and, therefore, no basis for extending 60

day credit to the Stores.

30.     Although Nigri caused the Stores to delay payments due to the Debtor for

inventory sold, at the same time he caused the Debtor to prioritize payments to the non-debtor

affiliate suppliers that he owns and controls.  In fact, the Debtor repaid both PGLA Sportswear

and Mega Wear in full for its alleged post-petition debt to each of those entities, and with respect

to Mega Wear, approximately $115,000 was paid in excess of its alleged post-petition debt to

such entity.  These payments were made despite the Debtor's potential preference claims of

approximately $3,600,000 against PGLA Sportswear and of approximately $1,500,000 against

Mega Wear.  Berk Declaration, ¶¶ 13, 14.

31.     Moreover, with respect to PGLA Sportswear, the Debtor repaid all outstanding

amounts allegedly owed by PGLA Sportswear and then Nigri supposedly shut it down and

liquidated it.  Berk Declaration, ¶ 15.  The Committee has no idea where PGLA Sportswear's

assets went, including the proceeds of the potentially preferential transfers.  Nigri has clearly

elevated his personal interest above that of the Debtor's estate and the Debtor's unsecured

creditors.

32.     Also, it appears that before or at the time Nigri supposedly dissolved PGLA

Sportswear, he had PGLA Sportswear transfer some of its assets to a newly created entity owned

and/or controlled by Nigri named Jasmine L.A. Corp. ("Jasmine").  It appears that Nigri created

Jasmine simply to take over the operations of PGLA Sportswear.  In fact, Nigri admitted as much

at a December 8, 2014 meeting with the Committee's professionals.  Berk Declaration, ¶ 16.

**The Debtor's Lack of Cooperation with the Committee**

33.     The Committee has not been able to conduct a full investigation of the Debtor's

transactions with its affiliates because the Debtor has not been cooperative in providing the

Committee with requested documents and information.  Berk Declaration, ¶ 17.  This lack of

cooperation to prevent the pursuit of claims against himself and his non-debtor companies is

grounds for the appointment of a chapter 11 trustee.

34.     The Debtor has not provided the Committee in a timely fashion (and in most

instances, not at all) with documents and information necessary for the Committee to do its job

and to protect the interests of unsecured creditors.  Berk Declaration, ¶ 18.  The Committee has

requested numerous documents and other information from the Debtor since the time the

Committed was appointed.  The Committee's initial request was made on July 22, 2014 by the

Committee's prior counsel.  The undersigned counsel for the Committee repeated those requests

on August 27, 2014 because the Committee received no response to the initial request.  Since

that date, the Committee has made numerous follow-up requests for documents and information.

35.     While the Debtor has provided some of the documents and information requested

as related to the Debtor, and a lesser percentage of the documents and information requested

relating to the Debtor's non-debtor affiliates, there are still many outstanding requests related to the Debtor and the Debtor's non-debtor affiliates for which the Debtor has yet to provide information, despite the Debtor's promises to do so. Berk Declaration, ¶ 18 & Exhibit 5 thereto. The Committee believes that the Debtor's failure to respond to the Committee's requests is the result of Nigri's desire to shield himself and his other entities from the scrutiny of the Bankruptcy Court.

36.    As discussed herein, conversion of this chapter 11 case to a case under chapter 7 is not appropriate under the circumstances. Instead, this Court should immediately direct appointment of a chapter 11 trustee.

## JURISDICTION

37.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this proceeding and this Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 1104(a) and 1106(a) of the Bankruptcy Code.

## RELIEF REQUESTED

38.    By this Motion, the Committee respectfully requests that this Court enter an order immediately directing appointment of a chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code, and for related relief, including immediately terminating the Debtor's authority to use cash collateral pending the appointment of a chapter 11 trustee and directing the Debtor to transfer sufficient funds to fund the Carve-Out into escrow with its counsel. This Motion also constitutes the Committee's opposition to the Conversion Motion.

39.     The Committee filed contemporaneously herewith a motion seeking to schedule the hearing on this Motion on shortened notice and at the same time or before the time that the Debtor's Conversion Motion is heard by this Court (which is currently December 22, 2014 at 11:00 a.m.).

## ARGUMENT

**A.     This Court Should Appoint a Chapter 11 Trustee Instead of Converting this Chapter 11 Case to a Case under Chapter 7**

40.     This Court should deny the Conversion Motion and instead grant the instant Motion and immediately direct appointment of a chapter 11 trustee.  Given the circumstances of this case, the appointment of a chapter 11 trustee is absolutely necessary for unsecured creditors.  If this case is converted to chapter 7, unsecured creditors will end up receiving nothing on their claims.  The appointment of a chapter 11 trustee, however, would give unsecured creditors an opportunity for a more favorable outcome in this case.

### i.     The Debtor's Right to Convert this Case to Chapter 7 is Not Absolute

41.     Section 1112(a) of the Bankruptcy Code provides that:

> The debtor may convert a case under this chapter to a case under chapter 7 of this title, unless—
>
> (1)     the debtor is not a debtor in possession;
>
> (2)     the case originally was commenced as an involuntary case under this chapter; or
>
> (3)     the case was converted to a case under this chapter other than on the debtor's request.

11 U.S.C. § 1112(a).

42.     The Debtor asserts in the Conversion Motion that the Debtor is entitled, as a matter of right, to convert its chapter 11 case to a case under chapter 7 because none of the

enumerated exceptions of section 1112(a) of the Bankruptcy Code apply.  *See* Conversion

Motion, ¶ 24.  The Debtor's position is incorrect.

43.    Courts have rejected the argument that a debtor has the absolute right to covert a

case under chapter 11 to a case under chapter 7 if none of the exceptions set forth in section

1112(a)(1)-(3) apply.  *See, e.g.*, *In re Adler*, 329 B.R. 406, 408 (Bankr. S.D.N.Y. 2005) (rejecting

argument that debtor has absolute right to convert based on statutory language that court "may"

convert, rather than "shall" convert, and fact that conversion motion must be noticed to creditors

pursuant to Bankruptcy Rule 2002 and not by simply filing a notice to convert, which evidences

court's continued authority to determine the conversion motion); *Monroe Bank & Trust v.*

*Pinnock*, 349 B.R. 493, 497 (E.D. Mich. 2006) (holding that section 1112(a) does not confer an

absolute right of conversion on a debtor and remanding on issue of whether dismissal or

conversion was in best interests of estate and creditors where creditor objected to conversion and

moved to dismiss).

44.    Instead, in considering a debtor's conversion motion, "courts have either:  (1)

recognized that conversion may not be proper in situations involving 'extreme circumstances,' or

(2) engaged in some type of equitable analysis of the facts, and whether a debtor can propose or

has proposed a confirmable plan."  *In re Adler*, 329 B.R. at 409 (citation omitted).  "The extreme

circumstances approach requires a factual determination as to the existence of extreme

circumstances such as bad faith, abuse of process, or other gross inequity, and such cases usually

involve egregious conduct on the part of the debtor, who is seeking to use the bankruptcy process

abusively and selfishly rather than for its intended purpose."  *Id*. (citation omitted).

### ii.    Conversion of this Case to Chapter 7 is Not Appropriate

45.    Here, conversion is not appropriate because the "extreme circumstances"

necessary to deny conversion to chapter 7 are present.  First, the Debtor has evidenced its bad

faith by taking actions and engaging in conduct (including during the bankruptcy) to benefit its

sole owner at the expense of unsecured creditors.  Second, the Committee believes that the

Debtor and its affiliates did not act as separate entities, did not observe corporate formalities,

engaged in non-arms-length transactions, and held themselves out to creditors as a single legal

entity and, thus, the affiliates should be substantively consolidated with the Debtor[2] and a chapter

11 operating trustee appointed to manage the Debtor and its affiliates or to commence an action

against the affiliates to bring their assets into the Debtor's estate.  A chapter 11 trustee, rather

---

[2]  The Committee believes for all of the reasons discussed herein that the Second Circuit standard to substantively consolidate the Debtor and its affiliates can be met.  "The sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors."  *In re Augie/Restivo Baking Company, Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988). Under Second Circuit law, substantive consolidation is appropriate when (i) creditors dealt with the entities as a single economic unit and did not rely on their separate identity when extending credit, or (ii) the affairs of the debtors are so entangled that consolidation will benefit all creditors.  *Id.*  Bankruptcy courts have the authority to substantively consolidate a debtor and non-debtor entities.  *See, e.g., Kapila v. S & G Fin. Servs., LLC (In re S&G Fin. Servs.)*, 451 B.R. 573 (Bankr. S.D. Fla. 2011) (finding that it is within equitable power of bankruptcy court to substantively consolidate debtor and non-debtor entities and that bankruptcy court has "jurisdiction over non-debtor entities to determine the propriety of an action for substantive consolidation insofar as the outcome of such proceeding could have an impact on the bankruptcy case" and holding that trustee established *prima facie* case for substantive consolidation of debtor and non-debtor entities because trustee alleged (i) debtor's principal owed 100% of debtor and non-debtor entities; debtor and non-debtor entities transferred assets among themselves without observance of corporate formalities and commingled assets and business functions; principal diverted assets of debtor to non-debtor entities, and non-debtor entities had no legitimate business purpose independent of debtor, and, therefore, (ii) benefit to creditors outweighed potential harm to non-debtors which were alleged to be nothing more than sham entities created to improperly shield debtor's assets from creditors).  Many bankruptcy courts have permitted substantive consolidation of a debtor and non-debtor entities.  *See In re LLS America, LLC*, 2012 WL 2042503 (B.A.P. 9th Cir. June 5, 2012) (affirming bankruptcy court order substantively consolidating estates of debtor and non-debtor entities pursuant to substantive consolidation standard identical to the Second Circuit's *Augie/Restivo* standard); *In re Bonham*, 229 F.3d 750, 765 (9th Cir. 2000) (citing *In re Creditors Serv. Corp.*, 195 B.R. 680 (Bankr. S.D. Ohio 1996)); *In re Logistics Info. Sys., Inc.*, 432 B.R. 1 (D. Mass. 2010); *Matter of New Center Hospital*, 187 B.R. 560 (E.D. Mich. 1995); *In re Lahijani*, 2005 WL 4658490 (Bankr. C.D. Cal. Oct. 3, 2005); *In re Brentwood Golf Club, LLC*, 329 B.R. 802 (Bankr. D. Mich. 2005); *Bracaglia v. Manzo (In re United Stairs Corp.)*, 176 B.R. 359 (Bankr. D.N.J. 1995); *In re Munford, Inc.*, 115 B.R. 390 (Bankr. N.D. Ga. 1990); *In re Tureaud*, 45 B.R. 658 (Bankr. N.D. Okla. 1985), *aff'd*, 59 B.R. 973 (1986); *In re Crabtree*, 39 B.R. 718 (Bankr. E.D. Tenn. 1984).  To the extent substantive consolidation is not available under the circumstances here, the Committee believes that the assets of the Debtor's non-debtor affiliates could be brought into this case using alternative means such as veil piercing or alter ego theories and/or through the filing of involuntary petitions against such entities.

than a chapter 7 trustee, would be in the best position to achieve these results as a chapter 11 trustee with retail turnaround experience would be in a better position to operate the Debtor and its affiliates for the benefit of creditors than a chapter 7 trustee without retail management experience whose goal would be to liquidate rather than operate the business.

46.    In addition, a comparison of the equities of converting this case to chapter 7 or appointing a chapter 11 trustee leads to the conclusion that this case should not be converted. While conversion of this case to chapter 7 will result in unsecured creditors recovering nothing, the appointment of a chapter 11 trustee will give unsecured creditors the best opportunity for a recovery.  Conversion to chapter 7, therefore, would not serve the best interests of the Debtor's estate and creditors.

47.    In view of the foregoing, this Court should deny the Conversion Motion and instead immediately direct appointment of a chapter 11 trustee.

**B.    The Appointment of a Chapter 11 Trustee
Pursuant to Section 1104(a) of the Bankruptcy Code
<u>is Necessary, Appropriate, and Required</u>**

**i.    Legal Standard**

48.    Section 1104(a) of the Bankruptcy Code provides as follows:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
>
> (1)    for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities; or

(2)    if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

49.    Accordingly, under section 1104(a) of the Bankruptcy Code, a court is required to appoint a trustee: (i) at the request of a party in interest; (ii) at any time prior to plan confirmation; and (iii) when either cause exists, including fraud, dishonesty, incompetence, or gross mismanagement, or such appointment is in the best interest of creditors.  *See* 11 U.S.C. § 1104(a).

50.    The requirements for the appointment of a chapter 11 trustee are satisfied here. The Committee is a party in interest and no plan has been confirmed.  Further, not only does sufficient cause exist to appoint a trustee, but such appointment is in the best interest of the Debtor's estate and creditors.

**ii.    The Debtor's Mismanagement and Derogation of Its Fiduciary Duties to Unsecured Creditors Provides Sufficient Cause for Appointment of a Trustee**

51.    A finding of "cause" under section 1104(a)(1) of the Bankruptcy Code mandates the appointment of a trustee.  *See Oklahoma Refinancing Co. v. Blaik (In re Oklahoma Refinancing Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).  Although the Bankruptcy Code does not define "cause," the "[f]actors relevant to the appointment of a trustee under § 1104(a)(1) include: conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries; … various instances of conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence."  *In re Altman*, 230 B.R. 6, 16 (Bankr. D. Conn. 1999), *aff'd in part, vacated in part*, 254 B.R. 509 (D. Conn. 2000).

52.     As set forth in this Motion, substantial "cause" exists to appoint a trustee under section 1104(a)(1) of the Bankruptcy Code.

53.     First, a conflict of interest exists that necessitates the appointment of a chapter 11 trustee. Nigri is the 100% shareholder of the Debtor as well as the 100% shareholder of the non-debtor affiliates. Nigri Declaration, ¶¶ 1, 5, 6, 22. Upon information and belief, Nigri owns and/or controls each of the affiliated entities identified on Exhibit 2 to the Berk Declaration. Nigri has made decisions as the sole owner of such entities to benefit himself at the expense of the Debtor's estate and creditors. Nigri has caused the Stores to delay payment to the Debtor for inventory they purchased from the Debtor, while causing the Debtor to prioritize payment to certain non-debtor affiliate suppliers in full for the same inventory. Berk Declaration, ¶¶ 13, 14. Such actions have cut off the Debtor's most important sources of cash flow and contributed to the Debtor's financial distress. In addition, Nigri has made decisions with respect to PGLA Sportswear, including having the Debtor pay amounts alleged owed to PGLA Sportswear in full and then dissolving PGLA Sportswear, without addressing an approximately $3,600,000 potential preference claim the Debtor has against PGLA Sportswear. *Id*. ¶¶ 14, 15. Nigri has also caused the Debtor to pay Mega Wear not only the alleged amounts it owed to Mega Wear, but an additional $115,000 for no apparent legitimate reason, and despite a $1,500,000 preference claim against Mega Wear. *Id*. ¶ 14. Moreover, Nigri has engaged in non arms-length transaction between the Debtor and the Debtor's non-debtor affiliates which have been unfair to the Debtor's estate and creditors. It is clear that Nigri has elevated his personal interests (including those of his wholly-owned non-debtor affiliates) above those of – and to the detriment of – unsecured creditors. A chapter 11 trustee must be appointed given these conflicts of interest. *See In re Cajun Elec. Power Coop., Inc.*, 74 F.3d 599, 600 (5th Cir. 1995) (appointing

trustee on rehearing because of conflict of interest of debtors' board members); *In re Fiesta Homes of Georgia*, 125 B.R. 321, 325-26 (Bankr. S.D. Ga. 1990) ("[T]he presence of a conflict of interest constitutes cause for removal of the Debtor in Possession from administration of this case."); *In re Nautilis of New Mexico, Inc.*, 83 B.R. 784, 789 (Bankr. D.N.M. 1988) (holding that conflict of interest of debtors' controlling owner warranted appointment of trustee).

54.     Second, the Debtor's disregard for the interests of unsecured creditors is in complete derogation of its fiduciary duties and cause for the appointment of a trustee.  Congress has mandated that debtors-in-possession act as honest brokers in exercising their fiduciary duties to the estate and their creditors.  *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("[T]he willingness of courts to leave debtors in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.").

55.     Here, the Debtor is not acting as a fiduciary of the estate or its creditors.  Instead, as discussed above, the Debtor is taking actions intended to solely benefit Nigri at the expense of the Debtor's estate and creditors.  Moreover, in addition to cutting off the most significant sources of the Debtor's cash flow, taking actions that have rendered worthless substantial valuable claims against affiliates, and engaging in transactions that are unfair to the Debtor's estate and creditors, the Debtor has not been cooperative with the Committee.  Without such cooperation, the Committee is unable to uphold its responsibilities to unsecured creditors and to determine whether claims should be pursued against the Debtor's insiders and/or non-debtor affiliates.  The appointment of a trustee is therefore essential.

56.     Finally, the Debtor's lack of cooperation and apathy toward the Committee as discussed above alone constitutes further "cause" for the appointment of a chapter 11 trustee.

Courts have regularly found that acrimony between a debtor and its creditors is sufficient "cause" to appoint a trustee. *See Marvel Entm't Grp., Inc.*, 140 F.3d 463, 473 (3d Cir. 1998) (holding that acrimony between debtor-in-possession and creditors is sufficient "cause" under section 1104(a)(1) of the Bankruptcy Code to warrant appointment of a trustee); *In re Eurospark Indus., Inc.*, 424 B.R. 621, 630 (Bankr. E.D.N.Y. 2010) ("[A]crimony between the creditors and the debtor's management, standing alone, has been found to be a basis to appoint a chapter 11 trustee under 11 U.S.C. § 1104(a)(1).") (citing *Marvel Entm't Grp.*); *In re The Bible Speaks*, 74 B.R. 511, 513 (Bankr. D. Mass. 1987) ("[T]he need for a neutral party to mediate disputes between the debtor and its creditors are grounds for a trustee's appointment."). For the reasons discussed above, the Committee has completely lost confidence in the Debtor.

57.    The only path forward that adequately addresses the interests of the parties involved in this case is the appointment of a chapter 11 trustee. *See Marvel Entm't Grp.*, 140 F.3d at 475 (supporting the district court's exercise of its discretion to appoint a trustee based on the fact that "the parties [were] sharply divided on many issues, and [were] incapable of resolving them [at that time.]").

### iii.    Appointment of a Trustee is in the Best Interests of the Debtor's Creditors

58.    Section 1104(a)(2) of the Bankruptcy Code provides that the Court may appoint a trustee if such appointment is "in the interests of creditors." *See* 11 U.S.C. § 1104(a)(2); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1227 (3d Cir. 1989). Section 1104(a)(2) of the Bankruptcy Code recognizes the "practical reality that [in certain cases] a trustee is needed." *See In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 527 n.11 (Bankr. E.D.N.Y. 1989).

59.      Courts have considered several factors when determining whether the appointment of a chapter 11 trustee is in the best interests of creditors, including:  (i) the debtor's trustworthiness; (ii) the lack of creditor confidence in the debtor's management; and (iii) the relative benefits of appointing a trustee versus the costs.  *See Euro-America Lodging Corp.*, 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007) (citing *In re Ionosphere Clubs, Inc.*, 113 B.R. at 168). Each of these factors militates in favor of appointing a chapter 11 trustee.

60.      The appointment of a chapter 11 trustee is clearly in the best interests of creditors given the circumstances of this case.  The Debtor cannot be trusted based on its conduct and actions discussed above that have been taken at the expense of the Debtor's estate and creditors for the benefit the Debtor's sole shareholder.  To make matters worse, the Debtor has told the Committee that approximately 75% of the Stores' sales are cash sales.  Given the potential for Nigri to divert the proceeds of the Stores' cash sales, the Committee does not trust Nigri to run a liquidation process that is fair to creditors.  Because of such conduct and actions, and the Debtor's lack of cooperation with the Committee, the Committee has completely lost confidence in the Debtor's ability to act as a fiduciary for the interests of the Debtor's estate and creditors. The appointment of a chapter 11 trustee would, therefore, provide a significant benefit to the Debtor's estate and creditors and drive this case to a more successful conclusion with minimal additional cost to the Debtor's estate.

61.      Accordingly, the appointment of a chapter 11 trustee is in the best interest of the Debtor's estate and creditors.

62.      In sum, the appointment of a chapter 11 trustee under the circumstance of this case is necessary, appropriate, and required.  The Debtor's financial advisors – CBIZ Accounting, Tax & Advisory of New York, LLC and CBIZ, Inc. (together, "CBIZ") – has

extensive retail turnaround and advisory experience and is familiar with the Debtor's business.

The Committee requests the this Court immediately direct appointment of CBIZ, or some other

person or entity with similar qualifications, as the chapter 11 trustee for the Debtor.

**C.    This Court Should Terminate the Debtor's
Authority to Use Cash Collateral Pending the
Appointment of a Chapter 11 Trustee**

63.     Nigri's decision to direct the Stores to delay payments to the Debtor for inventory

they previously purchased from the Debtor, which has contributed to the Debtor's deteriorating

financial condition, has caused the Debtor to violate the terms of the Final Cash Collateral Order.

The Debtor (i) has continually exceeded the aggregate 10% negative expense disbursement

variance, Final Cash Collateral Order, ¶ 3, and (ii) has not complied with the requirement that it

may exceed the 10% negative Inventory Payments disbursement variance only upon the pre-

approval of the Bank and the Committee.  *Id*.

64.     In light of the Debtor's violation of the Cash Collateral Order, and given the

status of this case and the depletion of the Debtor's assets, the Committee requests that this Court

– to the extent a chapter 11 trustee is not immediately appointed – terminate the Debtor's

authority to use cash collateral pending the appointment of a chapter 11 trustee.  Such relief is

consistent with this Court's direction during the December 4, 2014 conference call that the

Debtor should not transfer any assets to an insider without the consent of the Committee and the

United States Trustee or authority of this Court.

**D.    This Court Should Direct the Debtor to Transfer
Sufficient Funds to Fund the Carve-Out into
Escrow with Its Counsel**

65.    To the extent a chapter 11 trustee is not immediately appointed, the Committee requests that this Court direct the Debtor to transfer sufficient funds to fund the Carve-Out into escrow with its counsel.

66.    By email to the Debtor's counsel dated December 10, 2014, counsel for the Committee requested that the Debtor place in escrow funds sufficient to fund the Carve-Out under the Final Cash Collateral Order, but the Debtor refused to agree to do so.

67.    Given the depletion of the Debtor's assets, as well as the right of the Committee's professionals to payment under the terms of the Compensation Order, the Committee requests that this Court – to the extent a chapter 11 trustee is not immediately appointed – direct the Debtor to immediately transfer sufficient funds to fund the Carve-Out into escrow with its counsel.

## NOTICE

68.    Notice of this Motion has been provided to (i) the Debtor, (ii) JPMorgan Chase Bank, NA, (iii) the Office of the United States Trustee for Region 2, and (iv) all parties that have filed requests for notice in this chapter 11 case.  The Committee respectfully submits that further notice of this Motion is neither required nor necessary.

69.    The Committee has not previously sought the relief requested herein from this Court or any other court.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that this Court enter an order granting

the relief requested herein, denying the Conversion Motion, and granting the Committee such other

and further relief as this Court may deem just and proper.

Dated:  New York, New York
        December 18, 2014

MOSES & SINGER LLP


By:    /s/ James M. Sullivan
       James M. Sullivan
       Christopher R. Gresh
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Tel: (212) 554-7800
Fax: (212) 554-7700

*Attorneys for the Official Committee
of Unsecured Creditors*